**LAMAR OUTDOOR ADVERTISING, INC., et al., Plaintiffs-Appellees,**

v.

**MISSISSIPPI STATE TAX COMMIS-SION, et al., Defendants-Appellants.**

No. 82–4076.

United States Court of Appeals, Fifth Circuit.

March 11, 1983.

John E. Milner, W. Timothy Jones, Peter M. Stockett, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants-appellants.

Center for Science in the Public Interest, Bruce Silverglade, Dir. of Legal Affairs, Washington, D.C., for amicus curiae.

Gary W. Gardenhire, Asst. Atty. Gen., Chief, Civ. Div., Oklahoma City, Okl., for State of Oklahoma.

Peter H. Meyers, Washington, D.C., for Accuracy and Action About Alcohol Addiction.

John F. Banzhaf, III, Washington, D.C., for Ash.

James K. Child, Jr., Henry E. Chatham, Jr., Richard D. Gamblin, Jackson, Miss., Jack H. Pittman, Hattiesburg, Miss., for plaintiffs-appellees.

Before GOLDBERG, GEE and HIGGIN-BOTHAM, Circuit Judges.

GEE, Circuit Judge:

This case presents the question whether certain statutes and regulations of the State of Mississippi violate our constitutional guarantee of freedom of speech because they effectively ban liquor advertising on billboards and in printed and electronic media originating within the state.*

Appellees are 56 outdoor advertising, newspaper, television and radio businesses that operate in Mississippi. They brought this action against the Mississippi State Tax Commission (the "Commission"), the individual Commissioners thereof, the Commission's Alcoholic Beverage Control Division (the "ABC Division"), and the Attorney General of the State of Mississippi. Each of the defendants is responsible for enforcement of at least part of the Mississippi liquor advertising ban. It was alleged that Mississippi's liquor regulatory scheme prevented appellees from accepting liquor advertising for publication or display within the state, causing them substantial losses of revenue.[1] The appellees sought a declaratory judgment that Mississippi's liquor advertising ban unconstitutionally abridged their commercial speech rights and an injunction against enforcement of the ban. Following a two-day trial, the district court granted appellees' prayers for declaratory and injunctive relief and the state brought this appeal.

Because an understanding of the precise structure of the challenged advertising laws within the wider context of the Mississippi liquor regulatory scheme is necessary to resolve the issues in this case, we begin by describing the elements of Mississippi law in some detail.

## I. The Local Option Alcoholic Beverage Control Law.

In 1966, the Mississippi Legislature enacted the Local Option Alcoholic Beverage Control Law (the "Local Option Law"). Miss.Code Ann. §§ 67–1–1 et seq. (1972). This statute strictly regulates manufacture, sale, distribution, possession and transportation in Mississippi of alcoholic beverages except light beers and wines.[2]

The Local Option Law allows a county, or a judicial district within a county, to "vote itself out from under" the otherwise state-wide prohibition of liquor maintained by the statute. Miss.Code Ann. §§ 67–1–3; 67–1–7 (1972). If by majority vote of its electors a county or judicial district votes to withdraw from state-wide prohibition, then,

---

* In accordance with Court policy, this opinion, being one which initiates a conflict with the rule declared in another circuit, was circulated before release to the entire Court, and rehearing en banc was voted by a majority of the judges in active service.

1. Appellees need not have violated the advertising ban or have been subjected to sanctions in order to have standing to challenge it. *Basiardanes v. City of Galveston,* 682 F.2d 1203, 1218–19 n. 19 (5th Cir.1982). "Laws restraining First Amendment rights may be challenged by those who allege a desire to engage in the proscribed or regulated activities although they have not yet done so." *Id., citing Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Beckerman v. City of Tupelo,* 664 F.2d 502, 506 (5th Cir.1981). In fact, the record shows that at least some appellee television stations have on occasion violated the ban and received warnings from the ABC Division, though no sanctions were imposed.

2. Miss.Code Ann. § 67–1–5(a) (1972) provides:

The words "alcoholic beverage" mean any alcoholic liquid capable of being consumed as a beverage by a human being, but shall not include wine containing not more than four per cent of alcohol by weight and shall not include beer containing not more than four per cent of alcohol by weight.

We shall use the terms "alcoholic beverages" and "liquor" interchangeably in this opinion to refer to beverages regulated by the Local Option Law.

subject to the "provisions and restrictions" of the Local Option Law, "possession and transportation" of liquor are legal throughout its jurisdiction. *Id.* However, the "manufacture, sale and distribution" of liquor is lawful only within incorporated municipalities, qualified resort areas, and clubs located within the county or judicial district. *Id.* In each county or judicial district, if an election is not held, or if the majority of electors votes against repeal, the Local Option Law continues to enforce strict prohibition within that jurisdiction: manufacture, sale and distribution of liquor, as well as possession or transportation, are banned completely. *Id.;* Miss.Code Ann. § 67–1–17 (1972).

At the time of trial, thirty-five "dry" counties and four judicial districts in other counties had not voted to legalize liquor. Forty-three "wet" counties and four judicial districts in other counties had voted to repeal prohibition to the extent permitted by the Local Option Law. Wet and dry jurisdictions are distributed randomly throughout the state. According to the testimony of the Director of the ABC Division, a majority of Mississippi's population resides in wet counties.[3]

Mississippi's liquor regulatory scheme incorporates several statutory provisions and regulations affecting advertisement of alcoholic beverages, all of which are challenged by the appellees. Section 97–31–1, enacted in 1916, completely bans all liquor advertising in the state. This provision is part of the "Intoxicating Beverages Offences" chapter of the Mississippi Code, which comprises Mississippi's pre-local option statutes that enforced complete prohibition of liquor in the state. Miss.Code Ann. §§ 97–31–1 *et seq.* (1972). The subsequently-enacted Local Option Law incorporated the Intoxicating Beverages Offences by reference, repealing "[a]ll laws and parts of laws in conflict with [the Local Option Law] only to the extent of such conflict." Miss.Code Ann. § 67–1–3 (1972). As we shall see, the advertising ban of the Local Option Law applies only to advertisements originating within Mississippi. Accordingly, since Section 97–31–1 is more extensive than the Local Option Law and must be read *in pari materia* with it, the scope of its advertising ban is limited to that of the Local Option Law as discussed below.[4]

The principal provisions challenged in this case are Miss.Code Ann. § 67–1–37(e) (1972) and its attendant regulation, Regulation No. 6. Section 67–1–37(e) provides:

The state tax commission, under its duties and powers with respect to the alcoholic beverage control division therein, shall have the following powers, functions and duties:

(e) To issue rules prohibiting the advertising of alcoholic beverages in the state in any class of media and to provide further that all advertising of the retail price of alcoholic beverages shall be prohibited except on placards or signs in the interior of licensed premises which are not visible from the exterior.

Pursuant to this statutory authority, the ABC Division has issued its Regulation No. 6:

No person, firm or corporation shall *originate* advertisement in this State dealing with alcoholic beverages by any means whatsoever, including but not limited to newspapers, radio, television, circular, dodger, word of mouth, signs, billboards, displays or any other advertising media . . . (emphasis added).

Regulation No. 6 provides exceptions for certain limited types of advertising. Each retail package store may erect a sign on its premises that states the name of the business, its ABC Division permit number, and the legend "Package Liquor Sold Here." The size of the lettering and location of the sign are specified. Retail package dealers may also maintain advertising displays in-

---

**3.** "Real Missippians (*sic*) know which counties are wet and which are dry and they know where to buy liquor in all of them." Rogers, *Real Missippians Stand When Car Horn Plays "Dixie",* Jackson Clarion Ledger-Daily News, Nov. 27, 1982, at 1.

**4.** Violation of Section 97–31–1 is punishable by a fine of up to $500 and imprisonment up to six months. Miss.Code Ann. § 97–31–3 (1972). Injunctive intervention is also available and may be sought by the state attorney general, district or county attorney, or a citizen. *Id.*

side their places of business so long as they are not placed in windows and do not attract attention from outside the building. In addition, the word "lounge" may be used on signs and in other forms of advertising to identify establishments holding permits to sell liquor for on-premises consumption. No other words suggesting that liquor is sold, such as "cocktails" or "bar," may be used. Regulation No. 6 further provides that all advertising not specifically permitted by statute or regulation is prohibited. Finally, the Regulation provides that advertising of doubtful legality may be submitted to the Commission for approval prior to publication.

Appellees also challenge Section 67–1–85 of the Local Option Law which, like Regulation No. 6, prohibits liquor advertising on billboards. Miss.Code Ann. § 67–1–85 (1972). This provision was amended by House Bill No. 905 in the 1982 session of the Mississippi Legislature to allow billboard advertising, except as to price, of native wines—wines produced principally from fruit grown in Mississippi—by Mississippi wineries. Miss.Code Ann. §§ 67–1–85, 67–1–5(q), 67–5–5 (Supp.1982). All other billboard advertising of alcoholic beverages remains prohibited.[5]

According to the testimony of Mr. L.R. Mashburn, the ABC Division's Chief of Enforcement, the policy of the ABC Division, consistent with the language of Regulation No. 6, is not to enforce the state's liquor advertising ban against anyone who does not "originate advertisement" of liquor within Mississippi. Mr. Mashburn further testified that the ABC Division has interpreted the phrase "originate advertisement in this State" to mean that the central place of publication or dissemination of the liquor advertisements must be within the physical boundaries of Mississippi. The state's policy is based upon a perceived lack of jurisdiction over out-of-state advertisers and is derived in part from two 1967 Opinions of the Attorney General of Mississippi.[6] In his opinion dated March 29, 1967, the Attorney General stated that Mississippi had no control over liquor advertisements in a magazine printed in another state and mailed into Mississippi. Later, on May 19, 1967, the Attorney General opined that "there would be no violation of our advertising law" if a magazine containing liquor advertisements were printed in Mississippi, shipped to Louisiana, and mailed for distribution from that state.

Mr. Mashburn testified that the state enforced its advertising ban against newspapers and magazines published in Mississippi and that the state considered itself without jurisdiction to ban advertisements in publications published in other states and circulated in Mississippi. Similarly, the state attempts to enforce its rules only against outdoor advertising physically located within its borders. Television and radio broadcasters physically located within the state

---

5. Appellees also have attacked certain remedial provisions of the Local Option statute and regulations to the extent that they are used to enforce the challenged substantive provisions. Miss.Code Ann. § 67–1–87 (1972), the general penalty provision of the Local Option Law, provides:

Any person convicted of a violation of any of the provisions of this chapter for which no other penalty is specifically provided herein, shall be guilty of a misdemeanor and shall be punished by a fine of not more than one thousand dollars ($1,000.00), or by imprisonment for not more than six months, or by both such fine and imprisonment.

Pursuant to its rulemaking authority, the ABC Division has promulgated Regulation No. 1 and Regulation No. 36. Regulation No. 1 provides that any person who violates any provision of the Local Option Law shall not be eligible to obtain any of the permits provided under that statute. Regulation No. 36 authorizes the Commission, which is the exclusive wholesaler of liquor in Mississippi, to remove any brand from its approved list whenever, in its discretion, "the best interest of the [ABC] Division may be served." The Commission has on occasion "delisted" brands that were illegally advertised. See Pretrial Order at 10–11.

Having found the challenged substantive provisions unconstitutional, the district court enjoined enforcement of Section 67–1–87 and Regulation Nos. 1 and 36 insofar as they are applied to enforce Mississippi's laws banning intrastate liquor advertising.

6. The extent of Mississippi's jurisdiction over out-of-state advertising businesses is not an issue in this case. Accordingly, we express no opinion on whether the state's view as to the extent of its jurisdiction is correct.

are prohibited from carrying liquor advertisements. However, because of the perceived lack of jurisdiction, this prohibition is not applied to those who broadcast such advertisements into Mississippi from stations and transmitters located in other states.

As this discussion makes clear, Mississippi statutes and regulations, as authoritatively interpreted by its Attorney General and ABC Division, effect a virtually complete ban of liquor advertising by intrastate media. Aside from *de minimis* exceptions for native winery billboards and advertising identifying the existence of a "lounge," no alcoholic beverage advertising may be displayed by any outdoor advertiser, newspaper, magazine, television station or radio station located within the borders of Mississippi. These restrictions do not apply to advertising displays inside package liquor stores or to printed or broadcast advertising directed into Mississippi by out-of-state media businesses. We are called upon to decide if a virtual prohibition of liquor advertising in intrastate media is within the power of a state to enact, or whether it impermissibly trammels the First and Fourteenth Amendment rights of appellees to disseminate commercial speech.

II. *Does First Amendment Protection of Commercial Speech Extend to Liquor Advertising by Mississippi Media Businesses?*

If liquor advertising is to be accorded any protection by the First Amendment, appel-

lees concede that it must qualify as protected commercial speech under *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) and its progeny. No contention is made that such advertising merits protection owing to any political or expressive elements it might contain. Indeed, liquor advertising is a paradigm of purely commercial speech. It is speech which does "no more than propose a commercial transaction," *Virginia Pharmacy, supra,* 425 U.S. at 762, 96 S.Ct. at 1825, 48 L.Ed.2d at 358, and which is "related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Commission,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341, 348 (1980).[7]

■ The determination that speech which a state has attempted to regulate or prohibit is commercial speech gives rise to a complex inquiry. Not all commercial speech enjoys First Amendment protection. *Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. Moreover, commercial speech that does lie within the First Amendment's scope may be subjected to greater governmental regulation than other forms of speech such as political expression. *Virginia Pharmacy, supra,* 425 U.S. at 771–72 n. 24, 96 S.Ct. 1830–31 n. 24, 48 L.Ed.2d at 364 n. 24. In this section, we address the state's first argument that the liquor advertising which appellees propose

---

**7.** Typically, the right to disseminate commercial speech has been asserted by those who seek to use it to promote their goods or services, *see e.g. Central Hudson, supra; Friedman v. Rodgers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979); *Bates v. State Bar,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); or by those who seek to benefit as recipients of the information. *Virginia Pharmacy, supra,* 425 U.S. at 756–57, 96 S.Ct. at 1823, 48 L.Ed.2d at 355; *see also United States Postal Service v. Athena Products, Ltd.,* 654 F.2d 362, 366 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982). In the case before us, the right to engage in commercial speech is asserted not by the speaker or members of his audience, but by those media businesses that relay the commercial speech from speaker to hearer

for a fee. Recently, the Supreme Court implicitly recognized that such parties have a right to disseminate protected commercial speech and standing to enforce that right when it allowed several outdoor advertising businesses to challenge a billboard ban and applied customary commercial speech analysis to their claims. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion, joined on this issue by Stevens, J.). Moreover, the Supreme Court has recognized that application of an advertising prohibition against a publisher and editor, and not against the advertiser, incurs "more serious First Amendment overtones." *Bigelow v. Virginia,* 421 U.S. 809, 828, 95 S.Ct. 2222, 2236, 44 L.Ed.2d 600, 615 (1975).

to disseminate is not protected commercial speech. Because we ultimately conclude that appellees' advertising is protected, we must next consider the state's argument that even if protected, liquor advertising may be subjected to the regulations Mississippi has chosen to enact. That issue is considered in Part IV below.

In a summary of its analysis of commercial speech cases, the Supreme Court stated the threshold question:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.

*Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. The state argues that liquor advertising in Mississippi is not protected commercial speech for three reasons. It asserts that such advertising will fail the lawful activity test and that it is inherently misleading. The state also contends that advertising of "hazardous products" is not protected by the First Amendment. We will consider each argument in turn.

Mississippi's argument that liquor advertising will fail the unlawful activity test is based upon the structure of the Local Option Law which makes the sale, transportation and possession of liquor completely illegal in large portions of the state. Relying upon dicta in several Supreme Court commercial speech cases, the state argues that in order for liquor advertisements to merit First Amendment protection, the activities promoted by the advertising must be legal everywhere in Mississippi. In *Central Hudson,* the Supreme Court stated that states may ban commercial speech "related to illegal activity." 447 U.S. at 564, 100 S.Ct. at 2350, 65 L.Ed.2d at 349. Conversely, in *Virginia Pharmacy,* the Court struck down a ban on advertising of prescription drug prices, the sale of which it characterized as an "entirely lawful activity." 425 U.S. at 773, 96 S.Ct. at 1831, 48 L.Ed.2d at 365. Mississippi argues that because sale or possession of alcoholic beverages are not "entirely lawful" activities throughout the state, advertising of liquor is "related to illegal activity" and is therefore not protected commercial speech. This facially plausible reasoning tracks the language, but not the sense, of the cases.

The font of the lawful activity requirement for commercial speech protection is *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). There, the City of Pittsburgh had enacted an ordinance prohibiting both sex discrimination in employment and an employer's utilization of advertisements indicating such discrimination. *Pittsburgh Press* was found to have violated a companion provision that forbade any person to aid an employer to violate the ordinance. *Pittsburgh Press* had published help-wanted advertisements in sex-designated columns. The Supreme Court affirmed an order that *Pittsburgh Press* cease and desist from publishing sex-classified job advertisements, rejecting its claims that the ordinance and order violated its First Amendment rights.

*Pittsburgh Press* was decided before the genesis of constitutional protection of commercial speech; at that time, commercial speech was treated as wholly outside the ambit of the First Amendment.[8] One of the arguments made by *Pittsburgh Press* was that the distinction between commercial and other speech should be abrogated and that commercial speech should be afforded full First Amendment protection. Justice Powell responded as follows:

> Whatever the merits of this contention may be in other contexts, it is unpersuasive in this case. Discrimination in employment is not only commercial activity, it is *illegal* commercial activity under the

---

**8.** *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). For an excellent discussion of the development and subsequent demise in the Supreme Court of the *Chrestensen* theory of unprotected commercial speech, *see* Comment, *First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine,* 44 U.Chi.L.Rev. 205, 207–22 (1976).

Ordinance. We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned "Narcotics for Sale" and "Prostitutes Wanted" rather than stated within the four corners of the advertisement.

The illegality in this case may be less overt, but we see no difference in principle here.

.  .  .  .  .

The advertisements, as embroidered by their placement, signaled that the advertisers were likely to show an illegal sex preference in their hiring decisions. Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.

413 U.S. at 388–89, 93 S.Ct. at 2560–61 (footnote omitted; emphasis original). Simply put, the Court determined that even if commercial speech were protected, advertising that proposed a transaction illegal in itself would not be. *Cf. Brown v. Hartlage*, 456 U.S. 45, 102 S.Ct. 1523, 1530, 71 L.Ed.2d 732 (1982) (solicitation which is "an invitation to engage in an illegal exchange for private profit" may be prohibited).

Later, when appropriate cases arose, the Supreme Court recognized that the First Amendment protects commercial speech and incorporated the *Pittsburgh Press* illegal activity distinction in its formulation of a framework for commercial speech analysis. *Virginia Pharmacy, supra; Central Hudson, supra.* Because the cases that developed this framework did not actually involve claims that the advertising in question was related to an illegal activity, the language relied upon by the state must be understood as merely a reaffirmation of the principle of *Pittsburgh Press.* Thus, when

the Supreme Court spoke in *Virginia Pharmacy* of protection for information about an "entirely lawful activity" it emphasized that "there is no claim that the *transactions proposed* in the forbidden advertisements are *themselves illegal* in any way." 425 U.S. at 772, 96 S.Ct. at 365 (emphasis added) (citing *Pittsburgh Press, supra*); *see also Carey v. Population Services International,* 431 U.S. 678, 700, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675, 694 (1977).

■ Application of these principles to the present case indicates that it is incorrect to assert that liquor must be "entirely lawful" everywhere in Mississippi before First Amendment protection attaches to its advertising. The proper focus under *Pittsburgh Press* is upon the legality of the *transaction proposed* by the advertising, not upon the geographical extent of the advertised product's legal availability. As in *Virginia Pharmacy,* and unlike *Pittsburgh Press,* there is no claim in this case that the appellees' liquor advertisements will propose an illegal transaction—*i.e.* an unlawful sale or purchase of liquor. On the contrary, the parties apparently assume that these transactions will occur in "wet" counties. Accordingly, Mississippi's first argument must fail.

Although we have concluded that the state's selected language from *Central Hudson* and *Virginia Pharmacy* cannot carry the freight it seeks to load on it, a recent decision raises a more serious question as to the protected status of liquor advertising in Mississippi. As we have explained, *Pittsburgh Press* and its progeny developed a narrow category of unprotected commercial speech consisting of advertising that proposes illegal transactions. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the Supreme Court expanded that category to encompass commercial speech "promoting or encouraging" an illegal activity even though the immediate transaction touted by the speech was itself legal. We therefore must decide whether within the context of Mississippi's local option scheme, liquor advertising im-

properly promotes or encourages illegal activity and is thereby deprived of First Amendment protection.

In *Flipside,* the plaintiffs attacked an ordinance that made it unlawful "to sell any items, effects, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs . . . without obtaining a license therefor." In response to the claim that this ordinance abridged the plaintiffs' commercial speech rights, Justice Marshall wrote for a unanimous Court:

> [I]nsofar as any *commercial* speech interest is implicated here, it is only the attenuated interest in displaying and marketing merchandise in the manner that the retailer desires. We doubt that the village's restriction on the manner of marketing appreciably limits Flipside's communication of information—with one obvious and telling exception. The ordinance is expressly directed at commercial activity promoting or encouraging illegal drug use. If that activity is deemed "speech," then it is speech proposing an illegal transaction, which a government may regulate or ban entirely.

455 U.S. at 496, 102 S.Ct. at 1192, 71 L.Ed.2d at 370 (emphasis original; citing *Central Hudson, supra,* 447 U.S. at 563–64, 100 S.Ct. at 2350; *Pittsburgh Press, supra,* 413 U.S. at 388, 93 S.Ct. at 2560). Though it is broader than that of *Pittsburgh Press,* we do not regard the principle announced in *Flipside* as broad enough to exclude all Mississippi liquor advertising from the First Amendment.

The statute in *Flipside* was narrowly drawn and "expressly directed at commercial activity promoting or encouraging illegal drug use." *Id.* Significantly, it incorporated a scienter requirement; its "marketed for use" standard "describes a retailer's intentional display and marketing of merchandise" in a way that encourages illegal drug use. *Id.,* 455 U.S. at 502, 102 S.Ct. at 1195, 71 L.Ed.2d at 374. Thus, it is clear

that the court in *Flipside* excluded from First Amendment protection only such commercial speech as actively and intentionally promotes or encourages illegal activity. *See Tobacco Accessories and Novelty Craftsmen Merchants Ass'n v. Treen,* 681 F.2d 378, 382 (5th Cir.1982) (no commercial speech right to display drug paraphernalia knowing its drug-related nature when paraphernalia itself is illegal).

■ We are asked to take judicial notice of the fact that liquor advertising will encourage activity unlawful in Mississippi.[9] Even assuming that sales and purchases will occur legally in wet counties, it is argued that advertising will induce Mississippi consumers to transport, possess, and consume alcoholic beverages in counties where those acts are illegal. We need not decide whether judicial notice is proper in this situation because even if we assume that some consumers are bound to engage in illegal acts based upon information received from liquor advertising, we cannot conclude that such speech is therefore outside the scope of the First Amendment. By contrast to the statute in *Flipside,* the Mississippi regulatory scheme is not directed at commercial speech that by its terms intentionally or actively promotes illegal activity. Mississippi does not ban only advertising that promotes or encourages violation of the Local Option Law; rather it prohibits *all* intrastate liquor advertising. No claim has been made, nor could one have been made, that all liquor advertising actively promotes illegal activity. We must therefore conclude that Mississippi has prohibited protected commercial speech.

■ We believe that the policies underlying First Amendment protection of commercial speech require that the "unlawful activity" exception be limited to those categories of commercial speech already identified by the Supreme Court—those that propose a transaction illegal in itself, or actively promote illegal activity. The First Amendment value of commercial speech de-

9. Judicial notice of this fact was taken by Chief Judge Keady in *Dunagin v. City of Oxford,* 489 F.Supp. 763 (N.D.Miss.1980), an appeal we also decide today. 701 F.2d 335 (5th Cir.1983).

rives from its informational function. *Central Hudson, supra,* 447 U.S. at 561–64, 100 S.Ct. at 2349–50, 65 L.Ed.2d at 348–49; *United States Postal Service v. Athena Products, Ltd.,* 654 F.2d 362, 367 (5th Cir. 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982). In order to guard society's interest in "the fullest possible dissemination of information," *Central Hudson, supra,* 447 U.S. at 561–62, 100 S.Ct. at 2349, 65 L.Ed.2d at 348, the Constitution forbids the government to pursue its objectives "by keeping the public in ignorance." *Virginia Pharmacy, supra,* 425 U.S. at 770, 96 S.Ct. at 1829, 48 L.Ed.2d at 363. This limitation on governmental action traditionally has lain at the heart of First Amendment jurisprudence. Outside the commercial speech context, the government may not suppress speech because of the effect it may have on the actions of the public unless it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). This standard also has been applied to commercial speech related to an "activity with which, at least in some respects, the State could not interfere." *Carey v. Population Services International,* 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977) (contraceptives) (quoting *Virginia Pharmacy, supra,* 425 U.S. at 760, 96 S.Ct. at 1825, 48 L.Ed.2d at 357).

Where purely commercial speech is concerned, the nexus between speech and illegal conduct need not be so immediate; incitement has not been required. *Flipside,*

*supra.* The public interest in the free flow of commercial information, a particularly hardy breed of expression, *Virginia Pharmacy, supra,* 425 U.S. at 771–72 n. 24, 96 S.Ct. at 1830–31 n. 24, 48 L.Ed.2d at 364 n. 24, will not be imperiled if speech actively promoting illegal action, which falls short of incitement, is unprotected. We must conclude, however, that the First Amendment guarantee of freely flowing channels of information would be seriously eroded if information could be deprived of constitutional protection whenever a state could conclude that some people might independently choose to act on it in an unlawful manner.[10] The possibility of unilateral illegal acts by his audience should not deprive a speaker's words of constitutional protection unless his words are directed toward producing the unlawful response. Mississippi may not ban all liquor advertising in intrastate media because some of its citizens may choose to use alcoholic beverages illegally.

Mississippi next argues that liquor advertising is not entitled to First Amendment protection because it is "generically misleading." *See Central Hudson, supra,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."). The state asserts that advertising will necessarily portray liquor consumption as appealing, fashionable and a badge of the "good life." It is argued that such advertising is misleading in two ways. First, the state asserts that because liquor consumption is hazardous to health, it is not

10. In *Virginia Pharmacy,* the Supreme Court refused to uphold a ban on advertising of prescription drugs based upon an assumption that advertising might induce illegal dispensation of drugs: "We do not assume ... that simply because low prices will be freely advertised, physicians will overprescribe, or that pharmacists will ignore the prescription requirement." 425 U.S. at 766 n. 21, 96 S.Ct. at 1828 n. 21, 48 L.Ed.2d at 361 n. 21. Similarly, as in the present case, there is always a possibility that consumers may use lawfully obtained prescription drugs in an unlawful manner. Nevertheless, drug advertising was accorded First Amendment protection. *See id.,* 425 U.S. at

787–90, 96 S.Ct. at 1838–39, 48 L.Ed.2d at 374–75 (Rehnquist, J., dissenting) ("The very real dangers that general advertising for such drugs might create in terms of encouraging [by increasing demand], even though not sanctioning, illicit use of them by individuals for whom they have not been prescribed, or by generating patient pressure upon physicians to prescribe them, are simply not dealt with in the Court's opinion."). *See also Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (advertising of abortions, a highly regulated service that is illegal in certain circumstances, is protected).

a desirable activity and favorable representations are therefore simply false. Second, it contends that because this presentation omits information about the potentially harmful effects of alcohol consumption, it is incomplete and inherently misleading. These arguments are not persuasive.

Mississippi's first argument apparently assumes that this court may determine as a matter of law that all liquor consumption is "bad" and that representations that it is "good" are therefore false or misleading. Those are subjective determinations that we are neither equipped nor empowered to make as a matter of constitutional law. The second argument, while more plausible, does not carry the state as far as it would like.

■ The evidence in this case establishes that liquor consumption, and especially its abuse, entails many potentially harmful physical effects. To the extent that liquor advertising omits these facts, the information conveyed is incomplete and a potential exists that some will be misled. However, Mississippi goes too far when it claims that this deprives the advertising of all constitutional protection. "Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all." *Central Hudson, supra,* 447 U.S. at 562, 100 S.Ct. at 2349, 65 L.Ed.2d at 348. Although the government clearly has the power to correct misleading omissions, "the preferred remedy is more disclosure, rather than less." *Bates, supra,* 433 U.S. at 375, 97 S.Ct. at 2704–05, 53 L.Ed.2d at 830; *In the Matter of R_____ M.J_____, Appellant,* 455 U.S. 191, 200–02, 102 S.Ct. 929, 936–37, 71 L.Ed.2d 64, 73 (1982); *Better Business Bureau v. Medical Directors, Inc.,* 681 F.2d 397, 405 (5th Cir.1982). "[T]he states may not place an absolute prohibition on certain types of potentially misleading information ... if the information also may be presented in a way that is not deceptive." *R_____ M.J_____, supra,* 455 U.S. at 203, 102 S.Ct.

at 937, 71 L.Ed.2d at 74; *Medical Directors, supra,* 681 F.2d at 405. Thus, where an advertisement had the potential to mislead by implying that the Better Business Bureau had endorsed the advertiser's services, we held that a prominent disclaimer of the Bureau's endorsement was the appropriate response. *Medical Directors, supra,* 681 F.2d at 405; *see also Bates, supra,* 433 U.S. at 384, 97 S.Ct. at 2709, 53 L.Ed.2d at 836; *R_____ M.J_____, supra,* 455 U.S. at 199–203, 102 S.Ct. at 935–937, 71 L.Ed.2d at 72–74. The Supreme Court also has suggested that the prohibition against prior restraints may be inapplicable to attempts to regulate misleading commercial speech. *Virginia Pharmacy, supra,* 425 U.S. at 771–72 n. 24, 96 S.Ct. at 1830–31 n. 24, 48 L.Ed.2d at 364 n. 24; *Athena Products, supra,* 654 F.2d at 367. Time, place, and manner restrictions also have been approved as methods of preventing misleading commercial speech. *See generally Virginia Pharmacy, supra,* 425 U.S. at 770–71, 96 S.Ct. at 1829–30, 48 L.Ed.2d at 363–64. These decisions convince us that any potential to mislead that liquor advertising may possess should be addressed within the framework of permissible regulation of commercial speech; these concerns do not warrant wholesale exclusion of liquor advertising from First Amendment protection.

Finally, Mississippi contends that in addition to the exceptions for advertising of unlawful activities and misleading advertising, the Supreme Court has refused to accord any First Amendment protection to commercial speech that advertises a product that is "hazardous beyond controversy." This argument is meritless; there is no "hazardous product" exception to the First Amendment nor could there well be without destroying the commercial speech doctrine. Many if not most products have hazardous potential; ropes, automobiles and shotguns are familiar examples.

In support of this argument, appellants rely principally[11] on *Capital Broadcasting*

11. Other cases relied upon for this proposition, rather than creating an exception for hazard-

ous product advertising, treat such advertising as *prima facie* within the First Amendment and

*Co. v. Mitchell,* 333 F.Supp. 582 (D.D.C. 1971) (three-judge court), *aff'd mem.* 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972). The three-judge district court in that case upheld a nationwide ban of cigarette advertising on television and radio:

> Whether the Act is viewed as an exercise of the Congress' supervisory role over the federal regulatory agencies or as an exercise of its power to regulate interstate commerce, Congress has the power to prohibit the advertising of cigarettes in any media.

*Id.* at 584. The state's claim that this case establishes a "hazardous product" exception to the First Amendment completely disregards the court's stated basis for its decision. *Capital Broadcasting* was decided before the Supreme Court had accorded any significant First Amendment protection to commercial speech:

> [I]t is dispositive that the Act has no substantial effect on the exercise of petitioners' First Amendment rights. Even assuming that loss of revenue from cigarette advertisements affects petitioners with sufficient First Amendment interest, petitioners, themselves, have lost no right to speak—they have only lost an ability to collect revenue from others for broadcasting their commercial messages. Finding nothing in the Act or its legislative history which precludes a broadcast licensee from airing its own point of view on any aspect of the cigarette smoking question, it is clear that petitioners' speech is not at issue. Thus, contrary to the assertions made by petitioners, Section 6 does not prohibit them from disseminating information about cigarettes, and therefore, does not conflict with the exercise of their First Amendment rights.

*Id.* (citation omitted). This discussion clearly establishes that the court's decision was based upon its now-rejected view of the unprotected First Amendment status of advertising in general, and the rights of commercial broadcasters in particular, not upon any exception for advertising of "hazardous products." *See* note 7, *supra;* J. Nowak, R. Rotunda & J. Young, *Handbook on Constitutional Law* 778 (1978); *see also Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 92 n. 6, 97 S.Ct. 1614, 1618 n. 6, 52 L.Ed.2d 155, 161 n. 6 (1977) ("After Virginia Pharmacy Bd. it is clear that commercial speech cannot be banned because of an unsubstantiated belief that its impact is 'detrimental'.")

### III. The Appropriate Standard of Review.

■ Having decided that liquor advertising does not wholly lack First Amendment protection, we must now decide whether the First Amendment precludes the specific restrictions on commercial speech challenged here. This task entails an exercise that is common in constitutional adjudication: the Mississippi regulatory scheme must be evaluated in light of the appropriate standard of review. In an ordinary commercial speech case the appropriate standard of review is clear: a regulation of protected commercial speech is valid only if it directly advances a substantial governmental interest and is not more extensive than necessary to serve that interest. *Central Hudson, supra,* 447 U.S. at 566–67, 100 S.Ct. at 2351–52, 65 L.Ed.2d at 351. Mississippi vigorously contends, however, that this is not an ordinary commercial speech case. It argues that the Twenty-first Amendment [12] has bestowed enhanced police power upon Mississippi in the area of liquor regulation

---

apply the standard of review developed for commercial speech. Regulations prohibiting certain types of advertising in order to avoid perceived hazards have been upheld in these cases because they pass muster under this test, not because such advertising is wholly unprotected. *See e.g., Metromedia, supra* (billboards); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (trade names by optometrists); *Ohralik v. Ohio State Bar*

*Ass'n,* 436 U.S. 447, 454–55, 98 S.Ct. 1912, 1917–18, 56 L.Ed.2d 444 (1978) (in-person solicitation).

**12.** Section II of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the law thereof, is hereby prohibited."

and that laws enacted by virtue of that power are valid if they rationally further a legitimate state purpose. This "rational basis" test espoused by the state is much more deferential to state legislative judgments than the intermediate level of scrutiny required by *Central Hudson.* Therefore, before we can consider the validity of the Mississippi liquor advertising law, we must decide which of the various standards of review should be applied. This is not a simple inquiry, nor is the answer unequivocally indicated by either our cases or those of the Supreme Court. Indeed, upon initial examination, the two lines of relevant Supreme Court precedent seem to clash. However, after careful consideration of the Constitution and the cases, we have concluded that Mississippi law must pass muster under *Central Hudson* if the First Amendment rights of appellees are to be adequately vindicated.

To support the position that rational basis scrutiny is appropriate in this case, Mississippi relies upon *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) and *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981), the only cases in which the Supreme Court has directly addressed the interaction of the First and Twenty-first Amendments. In each of these cases, the Court employed the highly deferential standard of review espoused by appellants and rejected First Amendment attacks upon certain state liquor regulations. In response to the argument of the state, appellees point to another line of cases in which the Supreme Court has refused to dilute its customary standard of review for statutes impinging upon individual rights even though the statutes were manifestations of a state's Twenty-first Amendment power. *E.g. Wisconsin v. Constantineau,*

400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

In *California v. LaRue, supra,* the plaintiffs attacked on First Amendment grounds the rules of the California Alcoholic Beverage Control Department regulating the type of entertainment permitted in bars and night clubs that it licensed under state law. These rules prohibited in quite specific terms the performance of various actual or simulated sexual acts on licensed premises. Also prohibited was the display of films or pictures depicting such acts. The plaintiffs contended that these rules prohibited some forms of constitutionally protected expressive conduct and were thus facially unconstitutional. Although the Supreme Court agreed that at least some of the proscribed performances were protected,[13] nevertheless it sustained the validity of the rules.

Justice Rehnquist's opinion for the Court cited two interdependent reasons for this decision. First, the Court observed that the specific grant of authority in the Twenty-first Amendment has traditionally been recognized as conferring on the states something more than normal police power within its area of concern. While recognizing that the Twenty-first Amendment has never been read to supercede other constitutional provisions, the Court observed that "the case for upholding state regulation in the area covered by the Twenty-first Amendment is undoubtedly strengthened by that enactment." 409 U.S. at 115, 93 S.Ct. at 395, 34 L.Ed.2d at 350. Second, the Court noted that the states' power to regulate expression significantly increases when such expression consists in part of "conduct" or "action."[14] In this connection, the Court emphasized the findings of the California ABC Division after public hearings

---

**13.** The Court conceded that the rules would reach some presentations that would not be found obscene under *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and that could not be prohibited under the standards governing certain expressive conduct established in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

*LaRue, supra,* 409 U.S. at 116–17, 93 S.Ct. at 396–97, 34 L.Ed.2d at 351.

**14.** 409 U.S. at 117, 93 S.Ct. at 396, 34 L.Ed.2d at 351 (citing *Hughes v. Superior Court,* 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); *Giboney v. Empire Storage Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949)).

that the proscribed sexual conduct, when performed in establishments where liquor was served, gave rise to increased sexually-related crimes and violence in the area.[15]

Based upon these two factors—an "added presumption [of] validity" in the Twenty-first Amendment area, 409 U.S. at 118, 93 S.Ct. at 397, 34 L.Ed.2d at 352, and the additional power of the state to regulate expression that is also conduct—the Supreme Court applied a deferential standard of review to the California regulation. Because "[t]he Department's conclusion . . . that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one," the regulations were upheld. *Id.* In so holding, the Court emphasized that California's rules directly regulated only the dispensation of liquor; expression was affected only incidentally:

> [T]he critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink.

*Id.* In *New York State Liquor Authority v. Bellanca, supra,* the Supreme Court extended the holding of *LaRue* beyond regulation of acts of "gross sexuality" to uphold a prohibition of topless dancing in establish-

ments licensed to serve liquor. *Id.,* 452 U.S. at 717, 101 S.Ct. at 2601, 69 L.Ed.2d at 361.

Mississippi argues that *LaRue* and *Bellanca,* the only Supreme Court cases involving First Amendment challenges to liquor regulations, require application of rational basis scrutiny to Mississippi's liquor advertising law. We do not believe, however, that those cases go so far as to establish the broad proposition that any state law arguably proceeding from the state's Twenty-first Amendment power is entitled to so much judicial deference. Moreover, crucial differences between the regulations approved in *LaRue* and *Bellanca* and the Mississippi advertising law convinces us that we should take a closer look at the state law in this case.

As we have seen, a "critical fact" for the *LaRue* Court was that the state had not totally prohibited the plaintiff's expressive conduct. 409 U.S. at 118, 93 S.Ct. at 397, 34 L.Ed.2d at 352. It had merely prohibited performances in establishments that it licensed to serve liquor. Put another way, the state regulation was directed at the dispensation of liquor, not at the suppression of expression.[16] The plaintiffs' expressive activity was affected only incidentally by the state's refusal to allow liquor to be served contemporaneously.[17]

15. 409 U.S. at 111–12, 115–16, 93 S.Ct. at 395–96, 34 L.Ed.2d at 348, 350. The Supreme Court has continued to recognize that expression relating to sexual conduct may be restricted in some locations in order to avoid its undesirable collateral effects. *See e.g. Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (zoning of "adult" theaters to prevent urban blight).

16. *See California v. LaRue,* 409 U.S. at 119–20, 93 S.Ct. at 398, 34 L.Ed.2d at 353 (Stewart, J., concurring):

> Every State is prohibited by [the First and Fourteenth] Amendments from invading the freedom of the press and from impinging upon the free exercise of religion. But does this mean that a State cannot provide that liquor shall not be sold in bookstores, or within 200 feet of a church? I think not. For the State would not thereby be interfering with the First Amendment activities of the church or the First Amendment business of the bookstore. It would simply be controlling the distribution of liquor, as it has every

right to do under the Twenty-first Amendment.

17. This distinction was reiterated in *Bellanca,* where the Court compared the regulations in that case and *LaRue* with an ordinance disapproved by the Court in *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). *Bellanca, supra,* 452 U.S. 716, 101 S.Ct. at 2600, 69 L.Ed.2d at 360. The *Salem Inn* ordinance prohibited females from appearing topless, not only in bars, but in "any public place." *Id.* The Supreme Court held that the district court had not abused its discretion in ruling that the *Salem Inn* plaintiffs were likely to prevail on the merits of their First Amendment claim and therefore in granting a preliminary injunction. 422 U.S. at 931–34, 95 S.Ct. at 2567–69. Although the standard of review in a preliminary injunction context is less exacting than in a subsequent review of the merits, *id.* at 931–32, 95 S.Ct. at 2567–68, *Salem Inn* reinforces our conviction that laws directly regulating liquor, which may also incidentally burden expression, are on a different constitutional

■ In contrast, the Mississippi liquor advertising regulations are directly aimed at appellees' constitutionally protected commercial speech. They are not regulations of liquor dispensation that incidentally burden expression. In addition, unlike the rules in *LaRue* and *Bellanca,* the Mississippi advertising laws impose a virtually absolute ban upon appellees' expression; no alternative forums are open to Mississippi media businesses.[18] As the Supreme Court stated in *Central Hudson,*

> We review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy. In those circumstances, a ban on speech could screen from public view the underlying governmental policy. Indeed, in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity.

447 U.S. at 566 n. 9, 100 S.Ct. at 2351 n. 9, 65 L.Ed.2d at 351 n. 9 (citation omitted).

Because the Mississippi advertising scheme directly prohibits speech that lies within the ambit of the First Amendment, we would be reluctant to review it under a deferential standard developed for liquor regulations that only incidentally burden some protected expression, even if *LaRue* and *Bellanca* were the Supreme Court's only relevant pronouncements, which they are not. The absolute language of the First Amendment has always been thought to require stricter scrutiny. We cannot read the terms of the Twenty-first Amendment, which expressly grants regulatory authority over only liquor itself, to grant similarly broad power to regulate other things whenever liquor may be involved. As will be shown, a significant line of cases supports this view. In them, state laws passed pursuant to Twenty-first Amendment power were alleged to have abridged Constitutional guarantees made applicable to the states by the Fourteenth Amendment; the Supreme Court held that neither the scope of the constitutional rights nor the customary standard of review was changed by the operation of the Twenty-first Amendment. An examination of these decisions indicates that our review of Mississippi law in this case should proceed in the same manner.

In *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), a state statute provided that public officials could post a notice in all liquor stores that all sales or gifts of alcoholic beverages to a particular person were forbidden if "by excessive drinking," that person was "dangerous to the peace" of the community or had exposed himself or his family "to want." *Id.,* 400 U.S. at 434, 91 S.Ct. at 508, 27 L.Ed.2d at 517. The Supreme Court held that before the state could attach such a "badge of infamy" to a citizen, the requirements of procedural due process must be met. *Id.,* 400 U.S. at 437, 91 S.Ct. at 510, 27 L.Ed.2d at 518–19. Although recognizing the states' "extremely broad" power over liquor, *id.,* 400 U.S. at 436, 91 S.Ct. 509, 27 L.Ed.2d at 518, the Court did not relax the standards otherwise mandated by the due process clause. *See also Hornsby v. Allen,* 326 F.2d 605, 609 (5th Cir.1964) ("states do not escape the operation of the 14th Amendment in dealing with intoxicating beverages by reason of the 21st Amendment;" due process requirements apply to liquor licensing procedure); *Vintage Imports, Ltd. v. Joseph E. Seagram & Sons, Inc.,* 409 F.Supp. 497, 506–07 (E.D.Va.1976).

The relationship between the Twenty-first Amendment and other constitutional provisions was explicitly addressed in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). In that case, the Court held that an Oklahoma statute which prohibited the sale of 3.2% beer to males under the age of 21 and to females under the age of 18, invidiously discriminated against

footing than laws that directly and comprehensively prohibit the expressive activity itself.

**18.** Appellees are permitted by Regulation No. 6 to identify a "lounge" in their advertisements.

On-premises advertising is also permitted in retail liquor stores, but by definition, the appellee media businesses cannot utilize this medium.

males 18–20 years of age in violation of the equal protection clause. In its evaluation of the state's claim that the Twenty-first Amendment justified the statute, the Court traced the history of liquor regulation that culminated in passage of the Twenty-first Amendment and concluded that it "primarily created an exception to the normal operation of the Commerce Clause." 429 U.S. at 206, 97 S.Ct. at 461, 50 L.Ed.2d at 412.[19] The Court continued:

> Once passing beyond consideration of the Commerce Clause, the relevance of the Twenty-first Amendment to other constitutional provisions becomes increasingly doubtful. As one commentator has remarked: "Neither the text nor the history of the Twenty-first Amendment suggests that it qualifies individual rights protected by the Bill of Rights and the Fourteenth Amendment where the sale or use of liquor is concerned." P. Brest, Processes of Constitutional Decisionmaking, Cases and Materials, 258 (1975). Any departures from this historical view have been limited and sporadic.

*Id.; see also United States v. Texas,* 695 F.2d 136, at 138–139 (5th Cir.1983).

The Court unequivocally resolved the standard of review issue in *Craig:*

> We thus hold that the operation of the Twenty-first Amendment does not alter

the application of equal protection standards that otherwise govern this case. 429 U.S. at 209, 97 S.Ct. at 463, 50 L.Ed.2d at 414. *See also White v. Fleming,* 522 F.2d 730, 733 (7th Cir.1975) (notwithstanding Twenty-first Amendment, it "is still necessary to consider and apply the appropriate equal protection test"); *Women's Liberation Union of Rhode Island, Inc. v. Israel,* 379 F.Supp. 44, 48 (D.R.I.1974), *aff'd* 512 F.2d 106 (1st Cir.1975).

The Court in *Craig* distinguished *LaRue* by suggesting that the Twenty-first Amendment alone would have been insufficient to "strengthen" state power and dilute the standard of review; it was necessary to couple that factor with the "conduct" element of the affected expression.[20]

Most recently, the Supreme Court applied its customary standard of review for cases arising under the Establishment Clause[21] of the First Amendment in a case challenging a state liquor zoning statute. *Larkin v. Grendel's Den, Inc.,* —— U.S. ——, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982). The Court struck down a provision that vested in churches and schools the power effectively to veto liquor license applications for establishments within five hundred feet of the church or school. There was no question of the appropriate standard of review; the Court observed in a footnote that "[t]he State may not exercise its power under the

---

**19.** Although the Twenty-first Amendment's grant of power over transportation or importation of liquor logically includes other supplementary powers, "[w]e should not, however, lose sight of the explicit grant of authority." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 107, 100 S.Ct. 937, 944, 63 L.Ed.2d 233, 244 (1980). Moreover, even in the area of commerce the state's power under the Twenty-first Amendment is not free from other constitutional restraints. *Id.,* 445 U.S. at 108–09, 100 S.Ct. at 944–45, 63 L.Ed.2d at 245–46 (federal commerce power).

**20.** To put it bluntly, the Court gave *LaRue* short shrift:

> It is true that *California v. LaRue,* 409 [U.S. 109, 115, 93 S.Ct. 390, 395, 34 L.Ed.2d 342 (1972)], relied upon the Twenty-first Amendment to "strengthen" the State's authority to regulate live entertainment at establishments licensed to dispense liquor, *at least when the performances "partake more of gross sexual-*

*ity than of communication," [id.,* 409 U.S. at 118, 93 S.Ct. at 397, 34 L.Ed.2d at 352]. Nevertheless, the Court has never recognized sufficient "strength" in the Amendment to defeat an otherwise established claim of invidious discrimination in violation of the Equal Protection Clause.

429 U.S. at 207, 97 S.Ct. at 462, 50 L.Ed.2d at 413 (emphasis added). We are unwilling to read the second sentence of this passage as distinguishing *LaRue* from *Craig* solely because one case involved the First Amendment and the other, the Equal Protection Clause. Since both cases involved individual rights assertable against the states through the Fourteenth Amendment, we can discern no meaningful principle underlying such a distinction.

**21.** *See, e.g. Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

**330**

21st Amendment in a way which impinges upon the Establishment Clause of the First Amendment." *Id.* 103 S.Ct. at 510 n. 5.

These cases establish that when state laws related to liquor regulation have come in direct conflict with constitutional guarantees that the Fourteenth Amendment requires the states to respect, the Supreme Court has reviewed the state laws according to the standards otherwise applicable to the constitutional guarantees.[22] The Twenty-first Amendment did not change the standard of review. We believe that this principle should apply to the Constitution's guarantee of free speech as well as to its guarantees of equal protection and due process, and its prohibition of an establishment of religion. As we have explained, an exception to this principle, recognized in *LaRue* and *Bellanca,* was limited to liquor regulations that incidentally burden expression. Since that exception is not applicable to the Mississippi laws before us, we now turn to the application of customary commercial speech principles to the facts of this case.

*IV. Is the Mississippi liquor advertising law a permissible regulation of commercial speech?*

The Supreme Court recently dismissed a liquor advertiser's appeal for want of a substantial federal question thereby upholding an Ohio regulation of liquor advertising in *Queensgate Investment Co. v. Liquor Control Commission,* 69 Ohio St.2d 361, 433 N.E.2d 138, *appeal dismissed* —— U.S. ——, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982). To decide whether Mississippi's advertising ban is a permissible regulation of commercial speech, we therefore must first decide whether that decision is controlling in the present case. In *Queensgate,* the holder of an Ohio permit to sell liquor by the drink had challenged a state regulation that prohibited such permit holders from referring to price or price advantage in their advertising. Ohio law permitted all other forms of advertising by permit holders and also permitted manufacturers and distributors of liquor to advertise. *Id.* The Ohio Supreme Court rejected the permit holder's claim that the regulation violated its commercial speech rights and the Supreme Court summarily dismissed its appeal.

■ Although summary dispositions by the Supreme Court are binding on this court, those decisions extend only to "the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Moreover, they "should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Id.* The facts and issues in *Queensgate* are quite different than those in this case. The Ohio regulatory scheme was much narrower in scope than Mississippi's and its limitation to price advertising may well involve different state interests. Also, application of the regulation against liquor licensees raises different constitutional issues than enforcement of a subject matter ban against publishers and broadcasters. *See* note 7, *supra; cf. California v. LaRue, supra,* 409 U.S. at 118, 93 S.Ct. at 397, 34 L.Ed.2d at 352 (approving proscription of expression only in licensed establishments). As we have observed before, while Supreme Court summary dismissals of challenges to state statutes may caution us against finding analogous statutes of other states unconstitutional, we are not relieved of our duty "to undertake an independent examination of the merits." *Plante v. Gonzalez,* 575 F.2d 1119, 1126 (5th Cir.1978), *cert. denied* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979) (quoting *Bradley, supra,* 432 U.S. at 177, 97 S.Ct. at 2241). That undertaking is especially necessary where, as here, the Supreme Court's prior decision necessarily involved application of a complex standard like the *Central Hudson* test to very different facts. Rather than speculate upon the applicability of *Queensgate* beyond its own context, we will seek to

---

**22.** *See also Costa v. Bluegrass Turf Service, Inc.,* 406 F.Supp. 1003 (E.D.Ky.1975) (three-judge court) (durational residence laws for employees of liquor license holders subjected to compelling state interest test and held to violate plaintiffs' right to interstate travel).

apply the more completely articulated principles announced by the Supreme Court after full argument in its numerous commercial speech opinions. *See Bradley, supra,* 432 U.S. at 176, 97 S.Ct. at 2240, 53 L.Ed.2d at 205.[23]

The standards for reviewing restrictions on constitutionally protected commercial speech were explained by the Supreme Court in *Central Hudson:*

> The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

447 U.S. at 564, 100 S.Ct. at 2350, 65 L.Ed.2d at 349–50. We will consider each element of the test in turn.

The district court found that Mississippi's interest in its liquor advertising ban is the promotion of temperance and that this is a substantial state interest. Appellees do not challenge these findings. In its brief, the state characterizes its interest as "safeguarding the health, safety and general welfare of its citizens" by controlling liquor consumption. Regardless of whether Mississippi's interest is stated in terms of temperance or health and safety, the district court was clearly correct in finding it substantial. Maintenance of public health and safety is a basic function of government; it is obviously a substantial state interest. Though responsive in part to moral and ethical considerations, themselves appropri-

ate goals of state activity, the state's interest in temperance is closely allied with its interest in health and safety. Moreover, the long history of pervasive state and federal regulation of alcoholic beverages further supports our conclusion that this too is a substantial state interest. *See generally Craig v. Boren, supra,* 429 U.S. at 204–206, 97 S.Ct. at 460–461, 50 L.Ed.2d at 411–12 (collecting cases and statutes).

■ Since it is established that Mississippi is pursuing a substantial legislative end, the issue becomes whether it has chosen permissible means. We must first ask whether the advertising ban "directly advances" the health and safety of Mississippi residents; "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson, supra,* 447 U.S. at 564, 100 S.Ct. at 2350, 65 L.Ed.2d at 350. We have concluded that the Mississippi law does not pass muster under this test.

The district court found that the advertising ban, "practically, does little to directly advance the government's interest" for two reasons. First, the court noted that the state had failed to produce "concrete scientific evidence" to substantiate its position that liquor advertising stimulates consumption.· Thus, the court reasoned that the state had failed to show that an advertising ban furthered its goal in any way. The parties introduced conflicting expert testimony on this issue; the district court apparently credited the testimony of appellee's expert, who testified that the major function of liquor advertising is to increase market share and promote brand loyalty, and that no reputable scientific study had proved a positive correlation between liquor advertising and increased individual consumption. *See Cable-Com General, Inc., v. Crisp,* No. CIV–81–290–W (W.D.Okla. Dec. 18, 1981), *rev'd* 699 F.2d 490 (10th Cir.1983) (advertising ban is an indirect means of

---

**23.** In a recent decision, the Court of Appeals for the Tenth Circuit apparently thought that *Queensgate* required relaxation of the otherwise applicable standard of review for commercial speech regulations when the Twenty-first Amendment is involved. *Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490, 502 (10th Cir.1983). For the reasons discussed in Part III, *supra,* we decline to follow that decision.

advancing state interest in public health and welfare); *Oklahoma Telecasters Ass'n v. Crisp,* No. CIV–81–439–W (W.D.Okla. Dec. 18, 1981), *rev'd* 699 F.2d 490 (10th Cir.1983) (same). Mississippi argues that the district court was wrong to require evidence on this point and that based upon "common sense" this court should judicially notice that advertising increases consumption.[24] Although we are inclined to regard at least some increased consumption as an inevitable result of promotional advertising, judicial notice of that fact would not change our decision in this case. Even if it could be assumed that in the abstract advertising always promotes consumption instead of increased market share, we would be unable to determine that the intrastate advertising ban enacted by Mississippi directly promotes the state's interest in public health and safety. We reach this conclusion for the second reason cited by the district court: residents of Mississippi are exposed to so much liquor advertising from sources outside the state that the intrastate ban necessarily must have a minimal effect on consumption and hence little effect on promotion of the state's asserted interest.

Uncontradicted evidence in the record amply supports the district court's finding that "residents of the State of Mississippi are literally inundated with liquor advertisements from sources originating outside the state." For example, as the district court noted, appellees' evidence demonstrated that 62 national magazines containing alcoholic beverage advertisements were found in the Jackson, Mississippi Metropolitan Library at the time of trial. The library also subscribed to fifteen out-of-state newspapers carrying such advertising. The record also shows that several newspapers from neighboring states, such as the *Mobile Register* from Alabama and the New Orleans *Times-Picayune,* have substantial circulation within the state and contain such advertising. One such newspaper, the Memphis *Commercial Appeal,* publishes a special edition focusing on Mississippi news in which liquor ads appear. Finally, television and radio stations located in Alabama, Louisiana and Tennessee, together with cable television stations in other states, regularly broadcast wine commercials in Mississippi.

Given these facts, we must find that the Mississippi advertising law has not been designed carefully enough to withstand First Amendment attack. As we have seen, *Central Hudson's* intermediate level of scrutiny requires a close "fit" between legislative means and ends; the Supreme Court has declined to uphold commercial speech regulations where the nexus between the asserted interest and the regulation was speculative.[25] The state is required to es-

---

24. In *Central Hudson,* the Supreme Court took judicial notice that an electric utility's advertising increased demand for electricity and that the state's goal of energy conservation was thus directly advanced by an advertising ban. 447 U.S. at 569–70, 100 S.Ct. at 2353, 65 L.Ed.2d at 353. However, unlike the liquor advertisers in this case, the utility in *Central Hudson* had a monopoly; there was no possibility that its advertising would affect market share instead of consumption.

25. 447 U.S. at 564–65, 100 S.Ct. at 2350–51, 65 L.Ed.2d at 350; *see also Virginia Pharmacy, supra,* 425 U.S. at 769, 96 S.Ct. at 1829; *Bates, supra,* 433 U.S. at 378, 97 S.Ct. at 2706; *Linmark Associates, supra,* 431 U.S. at 95–96, 97 S.Ct. at 1619–1620. Contrary to appellants' argument, *Metromedia, Inc. v. City of San Diego, supra* did not vitiate this requirement. In that case, the court approved an ordinance allowing on-site commercial billboards but prohibiting off-site commercial billboards, stating that the city's distinction was "reasonabl[e]." 453 U.S. at 512, 101 S.Ct. at 2894, 69 L.Ed.2d at 817 (plurality opinion, joined in relevant part by Stevens, J.). Concurring in the judgment, Justice Brennan protested that *Central Hudson* requires more than rational basis scrutiny. *Id.,* 453 U.S. at 505 n. 12, 101 S.Ct. at 2891 n. 12, 69 L.Ed.2d at 831 n. 12. Whatever change in law *Metromedia* may have effected, it is not applicable here. *But see Oklahoma Telecasters Ass'n, supra,* 699 F.2d at 500–01 (liquor advertising ban is not "unreasonable" means of reducing consumption, relying on *Metromedia* ). Content-neutral speech restrictions have been scrutinized less closely than restrictions based on content, both inside and outside the commercial context. *See e.g. Virginia Pharmacy, supra,* 425 U.S. at 769–71, 96 S.Ct. at 1829–30, 48 L.Ed.2d at 363–64; *see generally* L.Tribe, American Constitutional Law §§ 12–2 to –3 (1978); Redish, *The Content Distinction in First Amendment Analysis,* 34 Stan.L.Rev. 113

tablish this relationship by record evidence. *Linmark Associates, supra,* 431 U.S. at 95–96, 97 S.Ct. at 1619–1620, 52 L.Ed.2d at 163–64. Mississippi has introduced nothing in this case which convinces us that its intrastate advertising ban has any appreciable affect on liquor consumption in light of the state's saturation with ads from out-of-state sources. Accordingly, the ban has not been shown directly to advance public health and safety. Indeed, we think at best it provides "ineffective" and "remote" support for the state's purpose. *Central Hudson, supra,* 447 U.S. at 564, 100 S.Ct. at 2350, 65 L.Ed.2d at 350. When a state chooses to impose such a severe ban upon protected commercial speech, it must at least show that its law does some good.

We recognize that our power to strike down state laws as unconstitutional is strong medicine; we do not administer it lightly. We also recognize that because of its perceived lack of jurisdiction over out-of-state media businesses and other practical constraints, the Mississippi legislature may be unable to fashion any liquor advertising ban consistent with our decision today.[26] As a federal court, we are always reluctant to invade the state legislative province so thoroughly. Nevertheless, we are convinced that our decision, though difficult, is required by the Constitution and the law. As we have seen, the First Amendment has been read to establish the principle that, as a general rule, our government may not seek its goals by fostering public ignorance. *Virginia Pharmacy, supra,* 425 U.S. at 769–70, 96 S.Ct. at 1829–30, 48 L.Ed.2d at 363. As Justice Blackmun put it, "This is because it is a covert attempt by the State to manipulate the choices of its citizens, not by persuasion or direct regulation, but by depriving the public of the information needed to make a free choice." *Central Hudson, supra,* 447 U.S. at 574–75, 100 S.Ct. at 2356, 65 L.Ed.2d at 356 (concurring opinion). While it is true that the *Central Hudson* test implies that suppression of information may sometimes be a permissible means of regulation in the commercial context, the general principle remains; substantial barriers were erected for states that follow this route. The barriers are not breached by the Mississippi laws challenged here.

## V. *Appellees' appropriate remedy.*

The district court declared each substantive provision of the advertising ban, Sections 67–1–37(e), 67–1–85, and 97–31–1, and Regulation No. 6, to be unconstitutional on its face and enjoined its enforcement. Because the virtual ban of intrastate liquor advertising effected by those provisions does not pass muster under *Central Hudson,* we affirm. Initially, we considered adopting of a limiting construction of Section 67–1–37(e), the provision granting rulemaking power to the ABC Division. As our prior discussion has demonstrated, the First Amendment does not deprive states of the power to make rules prohibiting advertising that misleads or actively encourages illegal activity. Similarly, rules could require advertising to contain state-prescribed disclosures or warnings. Although this limited rulemaking power is clearly constitutional, we have determined that a construction so limiting Section 67–1–37(e) is not appropriate action by a federal court. First, such a construction must be authoritative, and as a federal court we lack jurisdiction authorita-

(1981). *Metromedia* involved restrictions on the location of a particular medium of commercial expression—billboards. Those restrictions are reviewable under less stringent standards than a ban of particular subject matter—liquor ads. *See Central Hudson, supra,* 447 U.S. at 566 n. 9, 100 S.Ct. at 2351 n. 9, 65 L.Ed.2d at 351 n. 9 (review with special care regulations that entirely suppress commercial speech to pursue non-speech related goal); *cf. Metromedia, supra,* 453 U.S. at 525, 101 S.Ct. at 2901, 69 L.Ed.2d at 826 (Brennan, J., concurring).

**26.** Should such a statute be devised, it would still have to pass muster under the "least restrictive alternative" prong of the *Central Hudson* analysis. 447 U.S. at 569–70, 100 S.Ct. at 2353–54, 65 L.Ed.2d at 353–54; *see generally* Comment, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U.Chi.L.Rev. 205, 243–51 (1976). In light of our decision that the Mississippi law does not directly advance its interests, we need not reach this issue in this case.

tively to construe state laws. *Hynes v. Mayor of Orodell*, 425 U.S. 610, 622, 96 S.Ct. 1755, 1761, 48 L.Ed.2d 243 (1976); *United States v. Thirty-seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822, 830 (1971); *see also Metromedia, supra*, 453 U.S. at 521–22 n. 26, 101 S.Ct. at 2899–2900 n. 26, 69 L.Ed.2d at 823–24 n. 26. Moreover, the absolute terms of the statute may preclude any reasonable limiting construction.[27] We therefore hold that Sections 67–1–37(e), 67–1–85, and 97–31–1, together with Regulation No. 6, are facially unconstitutional and that the district court properly enjoined their enforcement.

█ The district court also extended its order to enjoin application of certain remedial provisions to the extent that they are used to enforce the substantive provisions discussed above. *See* note 5, *supra*. Application of the injunction to Section 67–1–87, the general penalty provision of the Local Option Law, is clearly proper; by its terms, it applies to any violation of the Local Option Law, including violation of the advertising ban by persons such as the appellees. This portion of the district court's judgment also is affirmed. In enjoining enforcement of Regulation No. 1 and Regulation No. 36, however, the district court's judgment goes too far. Regulation No. 1 prevents any person who violates the Local Option Law from obtaining any of the permits required to sell liquor under the statute. Regulation No. 36 authorizes the Commission, which is the exclusive liquor wholesaler in the state, to "delist" any brand from its approved list and has been used to punish distillers who advertised. The parties have stipulated that none of the appellee media businesses hold or have ever held any license under the Local Option statute, and that none are sellers or manufacturers of liquor. Thus, Regulations No. 1 and No. 36 could not be applied to them and could not operate to infringe their own rights. Since overbreadth standing is not available to parties asserting commercial speech claims, *Flipside, supra*, 455 U.S. at 496, 102 S.Ct. at 1192, 71 L.Ed.2d at 370, appellees lack standing to challenge regulations that would only infringe the rights of others.[28] Accordingly, the district court's judgment is reversed to the extent that it enjoins enforcement of Regulations No. 1 and No. 36.

To summarize, with the limited exception of the remedial regulations discussed above, we find that Mississippi's ban of liquor advertisements in intrastate media violates appellees' First and Fourteenth Amendment rights to disseminate commercial speech and is accordingly unconstitutional on its face.[29] The judgment of the district court is

27. The ABC Division is empowered, with limited exceptions, "[t]o issue rules prohibiting the advertising of alcoholic beverages in the state in any class of media and to provide further that all advertising of the retail price of alcoholic beverages shall be prohibited." Miss.Code Ann. § 67–1–37(e) (1972).

28. Under traditional overbreadth analysis, a litigant who has suffered no constitutional injury by application of a statute may attack it based upon its potentially invalid applications with respect to third parties with whom he has no special relationship. *E.g. Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980) (collecting cases); *see generally* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970). Because the doctrine is designed to protect against the "chilling effect" of overbroad statutes, it has not been applied to commercial speech, which is thought to be less easily deterred than other forms of expression. *Central Hudson, supra*, 447 U.S. at

565 n. 8, 100 S.Ct. at 2351 n. 8, 65 L.Ed.2d at 350 n. 8.

29. The district court also held that Mississippi's intrastate advertising ban violated the Equal Protection Clause. In view of our decision that the challenged law violates the First Amendment, we need not resolve this issue. We do think that it is appropriate, however, to point out that the district court's equal protection analysis was flawed. The district court held that because Mississippi was inundated with out-of-state advertising and because appellants had failed to prove a correlation between advertising and increased consumption, no rational basis for the state law had been shown. However, the issue under rational basis scrutiny is not whether the statute furthers the state interest *in fact*, but whether the state *rationally could have decided* that it would. *Arceneaux v. Treen*, 671 F.2d 128, 132 (5th Cir.1982). Moreover, the district court should have considered whether rational basis scrutiny was appropriate at all since stricter standards of re-

AFFIRMED IN PART AND RE-
VERSED IN PART.

view have been applied where fundamental rights guaranteed by the Constitution are infringed. *Id.* at 131–32; *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (First Amendment). These remarks are offered only to correct a misstatement of law below; we express no opinion on the merits of appellees' equal protection claim.

Appellees' complaint also asserted a claim under the Due Process Clause of the Fourteenth Amendment. The due process claim was not a basis of the district court's judgment and was not briefed or argued on appeal. We deem it abandoned.